**LSK&D #: 564-5010 / 801933**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

DEBORAH HOBSON,

                          Plaintiff,

            -against-

METROPOLITAN LIFE INSURANCE
COMPANY

                        Defendant.
-----------------------------------------------------------------x

**No. 05-CV-7321 (AKH)**

**DEFENDANT'S LOCAL
RULE 56.1 STATEMENT**

Defendant Metropolitan Life Insurance Company ("MetLife"), by its attorneys Lester Schwab Katz & Dwyer, LLP, submits the following statement of undisputed material facts pursuant to Local Rule 56.1.

**The Plan**

1.      KPMG established and maintains the Plan to provide LTD benefits for its eligible employees.  (Affidavit of Laura Sullivan ("Sullivan Aff."), ¶ 3, Ex. A ("SPD"), ML 2, 32).[1]

2.      The Plan is an employee welfare benefit plan governed by ERISA.  (Id., SPD, ML 33)  MetLife is the Plan's claims administrator and also funds Plan benefits through a group policy of insurance.  (Id., SPD, ML 3, 32, 33)

3.      The Plan grants discretionary authority to MetLife "to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan."  (Id., SPD, ML 33)

---

[1] "ML ___" refers to the Bates-stamped page number of the Exhibit.  The zeros preceding the number have been omitted.

4.      Under the Plan, "Disabled" means that, for the first 36 months following the Elimination Period,[2] the employee is "unable to perform the material and substantial duties of [his/her] own occupation."  (Id., SPD, ML 13)  After the first 36-month period, to be eligible for benefits, the employee must be "unable to perform any job for which [the employee is] qualified or for which [the employee] may become reasonably qualified . . taking into account [his/her] training, education or experience."  (Id.)

5.      The Plan limits benefits to 24 months for disabilities due to certain conditions, including mental or nervous disorders and neuromusculoskeletal and soft tissue disorders, as defined in the Plan.  (Id., SPD, ML 20)

**Hobson's LTD Benefits Claim**

6.      Hobson (date of birth August 1, 1956) worked for KPMG since 1998 as a "tax technician," which entailed preparing tax returns and related financial analyses.  It was a sedentary job; it involved sitting at a work-space and using a computer.  (Sullivan Aff., ¶ 4,  Ex. B ("Claim File"), ML 331)  Hobson was trained as a Certified Public Accountant.  (Id., Claim File, ML 451)

7.      Hobson's last day of work was February 12, 2001.  She filed a claim for disability benefits on the basis of a diagnosis of ulcerative colitis with symptoms of rectal bleeding, diarrhea and fatigue.  She listed her treating physician as Dr. Fernandez, a gastroenterologist.  (Id., Claim File, ML 1497, 1370)

---

[2] The "Elimination Period" is defined as the 25-week period beginning on the day the employee becomes disabled and during which no LTD benefits are payable.  (Id., SPD, ML 8, 12)

8.    Hobson submitted a letter from Dr. Sessoms, her rheumatologist, who diagnosed her with fibromyalgia and opined that she was unable to work.  (Id., Claim File, ML 1471)

9.    Hobson also submitted a report from Dr. Evans, a neurologist, who was treating her for migraines and back pain.  After receiving the results of MRIs of Hobson's brain, cervical and lumbar spine, and performing EMG and nerve studies, Dr. Evans concluded that the nerve studies were normal and there was no evidence of neuropathy, polyneuropathy or radiculopathy  Dr. Evans gave no opinion on whether Hobson could work.  (Id., Claim File, ML 1426-34)

10.    The MRIs conducted on August 29, 2001 revealed only "mild" abnormalities in the lumbar spine.  (Id., Claim File, ML 1431)

11.    MetLife initially approved Hobson's claim for short-term disability benefits and began investigating her LTD benefits claim.  (Id., Claim File, ML 35, 1460)

12.    MetLife received an Attending Physician's Statement ("APS") from Dr. Fernandez, who was treating her colitis, indicating that Hobson could return to work on August 22, 2001.  (Id., Claim File, ML 1078-79)

13.    MetLife referred the file to an independent rheumatologist (Dr. Jefrey Lieberman) to evaluate her diagnosis of fibromyalgia.  After contacting Hobson's rheumatologist Dr. Sessoms, Dr. Lieberman concluded that  Hobson did not have all signs and symptoms of  fibromyalgia, but even if she had that condition, it was not severe enough to be disabling.  (Id., Claim File, ML 1400-01)

14.    MetLife denied Hobson's claim effective August 13, 2001.  (Id., Claim File, ML 1388-90)

15.     Hobson, through her attorney Paul Coselli, appealed.  (Id., Claim File, ML 1231-38)

16.     MetLife sent the file to Dr. Joseph Nesta, an independent Board Certified Internist, for further review.  Dr. Nesta concluded that Hobson was not disabled from working.  (Id., Claim File, ML 1259-60)

17.     As part of its appeal process, MetLife sent IPC Dr. Nesta's report to Hobson's treating physicians for comment.  (Id., Claim File, ML 1215, 1218, 1221)

18.     Not receiving any comments or further medical reports, MetLife upheld its initial claim denial.  (Id., Claim File, ML 1203-08)

19.     In its letter dated March 12, 2002, MetLife explained that the medical documentation did not support Hobson's continued disability from working as a tax technician.  Specifically, the reasons for the claim denial were: a normal neurologic exam; the criteria for a diagnosis of fibromyalgia were not met; Dr. Fernandez had released Hobson to return to work following a colonoscopy; there was no evidence of cognitive deficits; and reported sleep disturbances had not been documented.  (Id.)

20.     Hobson submitted additional information regarding exacerbation of her colitis, rectal bleeding and anemia.  MetLife agreed to conduct a further review of the additional information.  (Id., Claim File, ML 51, 1145)

21.     Based on the additional medical information submitted, and after consultation with its nurse consultant and the IPC, MetLife decided to reinstate Hobson's LTD benefits.  (Id., Claim File, ML 53-55)

22.     Following an April 2003 review of medical information, including reports that Hobson's colitis and anemia were under control, and after consultation with IPC Dr.

Amy Hopkins, Board Certified in Internal and Occupational Medicine, MetLife again terminated Hobson's benefits.  (Id., Claim File, ML 61, 1091-92, 1116, 1110-11)

23.    Shortly thereafter, MetLife was informed that Hobson had undergone surgery on April 1, 2003 to cure her colitis.  (Id., Claim File, ML 862-63)  Hobson's surgeon performed a total colectomy  (removal of the large intestine) and ileostomy (formation of an opening at the end of the small intestine through the surface of the abdomen through which fecal matter is emptied).  (Id., Claim File, ML 62, 811-16)

24.    MetLife once again reinstated Hobson's benefits.  (Id., Claim File, ML 65, 778)

25.    In May 2004, MetLife again conducted a review of Hobson's eligibility in anticipation of the transition to the second-phase definition of disability (unable to perform any occupation) which would be effective in August 2004.  (Id., Claim File, ML 88-93)

26.    A MetLife nurse consultant ("NC") reviewed and analyzed the updated medical information as of May 2004.  (Id., Claim File, ML 90-93)  Her recommendation was that benefits should be discontinued.  (Id., Claim File, ML 92-93)

27.    The NC explained that  Hobson's ulcerative colitis had been surgically corrected and there was no evidence of functional impairments resulting from the surgery.  She noted that Hobson's asthma was being treated by medication.  Again, there was no indication that the asthma diagnosis resulted in disabling functional impairment.  With respect to Hobson's self-reported seizures, the NC noted that her neurologist Dr. Rossi had not precluded work activities due to reported seizure episodes.  With respect to the diagnosis of lumbar radiculopathy, the NC noted that

MRIs showed only mild disc degenerative disease and disc herniation, without evidence of nerve impingement or spinal cord compression or encroachment.  The test results did not support a disabling functional impairment.  Moreover, physical exams did not indicate decreased strength, sensation or range of motion in Hobson's back.  With respect to the diagnosis of obstructive sleep apnea, the NC noted that Hobson was being effectively treated with a nasal C-PAP device.  As to the diagnosis of fibromyalgia, the NC stated that the medical records did not support a disabling functional impairment.  (Id., Claim File, 92-93)  Finally, with respect to Hobson's diagnosis of major depressive disorder, the NC referred to a May 6, 2004 evaluation by MetLife's Behavioral Health Unit ("BHU") of Hobson's psychologist Dr. Wardell's medical information.  (See, id., Claim File, ML 93, 88-89.)  Dr. Wardell had not mentioned that Hobson had any cognitive deficits.  (See, id., Claim File, ML610-12, 619-23)  The BHU concluded that the medical information did not support a psychiatric disability.  (Id., Claim File, ML 88-89)  The NC further noted that, although internist Dr. Doshi and rheumatologist Dr. Sessoms had listed physical limitations in their reports, there were no objective physical exam findings to support such restrictions.  The NC concluded that the medical evidence did not support the existence of a functional impairment of such severity as to preclude Hobson from performing her sedentary job.  (Id., Claim File, ML 93)

28.    While the NC's evaluation was being reviewed by other MetLife claim personnel, Hobson reported that she had a yeast infection.  (Id., Claim File, ML 93-94)  MetLife requested further medical information and sent Hobson's entire file to an IPC for evaluation.  (Id., Claim File, ML 95)

29.    In his report dated July 20, 2004, IPC Dr. Nesta evaluated the medical records for Hobson's multiple diagnoses.  He noted that (1) Hobson's colectomy "should have cured her ulcerative colitis" (since her colon had been removed); (2) MRIs did not show any significant radiculopathy or more than slight disc  herniation; (3) Hobson's neurologist had not precluded her from working due to seizures or migraines; (4) Hobson's obstructive sleep apnea was being treated with a C-PAP device and should not affect her ability to work; (5) her hypertension was being controlled by medication; (6) her gastroesophagal reflux disease was being treated and was not the type of condition which would preclude work at a sedentary job; (7)  Hobson's asthma was being treated by medication and there was no indication that her pulmonology condition was work-limiting; (8) Hobson's yeast/fungal infection was not well documented and not disabling; and (9)  Hobson's diagnosis of  fibromyalgia did not preclude work activities. Dr. Nesta did not give an opinion as to Hobson's psychiatric diagnosis, since he lacked the  psychiatric  expertise  to  evaluate  it.   (Id., Claim  File,  ML  488-90)   Dr. Nesta concluded that, in his opinion, none of  Hobson's  multiple  non-psychiatric  diagnoses impaired her ability to work at a sedentary job.  (Id., Claim File, ML 490)

30.    MetLife sent Dr. Nesta's report to Hobson's physicians for comment along with requests for additional medical information.  (Id., Claim File, ML 97, 492-95)

31.    MetLife received a response by Dr. Price (infectious diseases specialist) dated July 27, 2004 agreeing with the IPC's report as to the yeast infection.  (Id., Claim File, ML 510)

32.     Dr. Doshi, Hobson's internist, also responded, disagreeing with Dr. Nesta's conclusions.   Dr. Doshi, however, did not submit any additional medical information.  (Id., Claim File, ML 507-08)

33.     MetLife determined that Hobson's claim would be discontinued effective August 12, 2004.  (See letter dated August 31, 2004, id., Claim File, ML 455-56, 105.)

34.     MetLife then received information from Hobson that she was being scheduled for surgery to treat thyroid cancer.  (Id., Claim File, ML 106-07, 461-62, 465-67, 399-400)

35.     After investigating Hobson's latest diagnosis, MetLife made the determination to reinstate Hobson's benefits through December 8, 2004.  (Id., Claim File, ML 445, 118-19)

36.     Hobson's surgeon Dr. Alford, who performed the thyroid operation on September 15, 2004, advised that she could return to full-time work in January 2005. (Id., Claim File, ML 115, 406-08)

37.     By letter dated December 15, 2004, MetLife again terminated Hobson's claim effective December 8, 2004, noting that she had recovered sufficiently from her successful thyroid surgery to return to work.  MetLife's letter advised Hobson's of her right to appeal.  (Id., Claim File, ML 357-58)

38.     By this time, the definition of disability in the Plan had changed from unable to perform one's "own occupation" to being unable to perform "any occupation." (Id., Claim File, ML 357-58; SPD, ML 13)

39.     Hobson requested a copy of the claim file which was sent to her on January 18, 2005.  (Id., Claim File, ML 126)

40.     Hobson appealed the claim denial by letter dated January 26, 2005.  (Id., Claim File, ML 224-25)  Hobson enclosed reports from her treating physicians and other documents (including 38 pages of general information on Dercum's disease)[3] in support of her appeal.  (See, id., Claim File, ML 228-330.)

41.     In addition to reports from her treating physicians on her previous diagnoses, Hobson submitted a report from Dr. Paul Subrt, a dermatologist, who diagnosed Hobson with Dercum's disease, a "rare, chronic condition of unknown etrology [which] presents with multiple symptoms, including, among others, painful adipose (i.e., fatty) tissue, extreme weakness and fatigability, chronic generalized pain, fibromyalgia, epilepsy, cognitive dysfunction and depression."  (Id., Claim File, ML 228)  Dr. Subrt stated Hobson exhibited all these symptoms and that there was no effective treatment.  While not giving an opinion as to whether  Hobson was disabled, he stated that Dercum's disease can "lead to lifelong debilitating disabilities."  (Id.)

42.     MetLife sent the file, including the materials submitted by Hobson as part of her appeal, to two IPCs for their review.  (Id., Claim File, ML 127)

43.     In his report dated February 14, 2005, Blair D. Truxal, M.D., Board Certified in Internal Medicine, concluded that the medical information did not support Hobson's inability to work.  (Id., Claim File, ML 207-12)  Dr. Truxal evaluated the records for each diagnosis, finding that the documentation showed that both colitis and thyroid cancer had been surgically cured.  Tests had revealed that  Hobson's spinal degenerative disease and disc herniation were mild and slight, respectively, and did not constitute a disabling condition.  Dr. Truxal noted that Hobson's reported seizures were

---

[3] Dercum's disease is a rare disease characterized by painful fatty swellings and nerve

not well-documented nor had they been observed by a physician. Similarly, documentation as to the severity and frequency of migraines was lacking. Sleep apnea was being effectively treated with a C-PAP device, Dr. Truxal observed. (Id.) Dr. Truxal considered Hobson's latest diagnosis of Dercum's disease to be her current primary diagnosis. He felt that the Dercum's disease diagnosis was not well documented or supported. Dr. Truxal noted that physical exams had failed to detect multiple lipomas (fatty nodules) under the skin which are key characteristics of Dercum's. Also, other diagnostic features like finger swelling or the presence of certain substances in the spinal fluid had not been reported. Moreover, there was no treatment plan mentioned by Hobson's doctors. (Id., Claim File, ML 211-12) Dr. Truxal concluded that:

> There is no documented medical evidence of Dercum's Disease to support an ongoing diagnosis for this, and as previously mentioned, the other medical diagnoses such as ulcerative colitis or thyroid cancer would not limit Ms. Hobson's ability to work.

(Id., Claim File, ML 212)

44.    In a report dated February 11, 2005, IPC Dr. John F. Delaney, Board Certified in Neurology and Psychiatry, concluded that the medical information in the file did not support Hobson's claim of inability to work at a sedentary job. (Id., Claim File, ML 213-18) Focusing on the neurologic and psychiatric diagnoses, Dr. Delaney found no evidence of significant radiculopathy, severe depression, or ongoing seizures which would render Hobson functionally impaired to the point of not being able to work at a sedentary job. (Id.)

---

lesions. Mosby's Medical, Nursing & Allied Health Dictionary, 5th Ed. (1998), p. 468.

45.     Based on the latest IPC reports and its evaluation of Hobson's entire file, MetLife, in a letter dated March 16, 2005, upheld its determination to discontinue LTD benefits to Hobson effective December 8, 2004.  (Id., Claim File, ML 202-06)

46.     Hobson requested, and MetLife forwarded to her, a copy of the claim file materials not previously sent to her.   (Id., Claim File, ML 195, 197)

47.     In a letter to MetLife dated April 1, 2005, Hobson critiqued MetLife's uphold letter and requested a further review.  (Id., Claim File, ML 184-87)

48.     MetLife decided to afford Hobson yet another claim review opportunity. MetLife sent the entire file for further review by independent specialists.  (Id., Claim File, ML 180-82)

49.     In a report dated April 22, 2005 (see, id., Claim File, ML 168-73), Dr. Robert N. Polsky, a Board-Certified Psychiatrist, noted that the file lacked a psychiatric evaluation of  Hobson as well as a complete mental status examination.  Dr.  Polsky observed that the available records did not document any cognitive deficits; on the contrary, Hobson's numerous well-written letters to MetLife contained "no hints of any cognitive impairment."  (Id., Claim File, ML 170)  Moreover, no records indicated that Hobson was suicidal, homicidal or psychotic.   Dr. Polsky contacted Dr. Wardell, Hobson's psychologist, who did not recognize Hobson's name at first and indicated that he could not discuss her condition without a valid release.  (Id.)  Dr. Polsky concluded that the medical documentation did not support any psychiatric functional impairments that would preclude her from working.  (Id.)

50.     The file was also reviewed by IPC Dr. Gary Markewich, Board Certified in Dermatology.  His report dated April 22, 2005 (revised April 25, 2005) focused on the

diagnosis of Dercum's disease.  Dr. Markewich noted that the diagnosis of Dercum's was actually made by Hobson, not her doctor, on the basis of research on the Internet. Dr. Markewich noted that Hobon's physical examination had been negative; a biopsy was negative for inflammation in the fat tissues; the few lipomas (fat nodules) scattered around Hobson's body were not significantly tender.  (Id., Claim File, ML 163-66)

51.    Dr. Markewich reported that he conducted a telephone discussion with Dr. Subrt, Hobson's dermatologist.  The IPC stated that Dr. Subrt did not feel that Hobson was disabled due to Dercum's disease.  Dr. Markewich concluded that, in his opinion, "from a dermatologic standpoint" there was no reason  Hobson could not perform a sedentary job.  (Id., Claim File, ML 165)

52.    By letter dated May 5, 2005, MetLife upheld its decision to terminate Hobson's benefits.  MetLife explained that it had had the file reviewed by two different independent physicians - - specialists in psychiatry and dermatology - - and saw no reason to change its previous claim decision.  The letter referred Hobson to the previous denial letters and enclosed copies of the IPC reports.  MetLife informed Hobson that no further appeals would be considered.  (Id., Claim File, ML 159)

53.    Hobson forwarded a letter from Dr. Subrt dated May 11, 2005.  In his letter, Dr. Subrt stated he wanted to clarify his position regarding his patient's disability claim.  He stated: "From a dermatologic standpoint, I do not discern any obvious disability in Ms. Hobson's case."  He further stated that he was not qualified to make a judgment about whether Hobson was disabled due to neurologic, psychiatric or rheumatologic involvement.  (Id., Claim File, ML 155)

54.     In a letter dated May 11, 2005, MetLife responded to Hobson, acknowledging receipt of the letter from Dr. Subrt.  MetLIfe stated that it had reviewed the additional information but determined that the letter did not alter MetLife's claim decision.  MetLife advised that further appeals would not be considered.  (Id., Claim File, ML 152, 142)

55.     Hobson submitted a letter dated May 17, 2005 from Dr. Wardell.   The psychologist explained that when he was contacted by IPC Dr. Polsky in April 2005, he was unable to provide any information because he had no authorization from his patient.  Also, since he had not seen Hobson since November 2003, he could not accurately assess her condition in April 2005.  Dr. Wardell stated that Hobson had returned to him on May 11, 2005 and "made an effort to bring me up to date on her condition."  Dr. Wardell opined that Hobson's depression had worsened "with more severe despondent episodes being reported."   Dr. Wardell concluded that "[t]his disorder is of sufficient severity that Ms. Hobson is unable to function consistently enough to sustain employment."  (Id., Claim File, ML 150)

56.     Dr. Wardell did not furnish any test results or other objective medical information to support his opinion.  (Id., Claim File, ML 142)

57.     In a letter dated May 19, 2005, MetLife stated that Dr. Wardell's letter did

not change its claim determination and that no further appeals would be considered.

(Id., Claim File, ML 151)

Dated:        New York, New York
              October 13, 2006

                              Respectfully submitted,

                              LESTER SCHWAB KATZ & DWYER, LLP


                              _____/S/_____
                              Allan M. Marcus  (AM-9027)
                              120 Broadway
                              New York, New York  10271
                              (212)  964-6611
                              Attorneys for Defendant
                              Metropolitan Life Insurance Company

TO:

Jason A. Newfield, Esq. (JN-5529)
Frankel & Newfield, P.C.
585 Steward Avenue - Suite 301
Garden City, New York  11530
(516) 222-1600
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
DEBORAH HOBSON,

                                **No. 05-CV-7321 (AKH)**

                     Plaintiff,

        -against-                  **DEFENDANT'S LOCAL
RULE 56.1 STATEMENT**

METROPOLITAN LIFE INSURANCE
COMPANY

                    Defendant.
-----------------------------------------------------------------x

**LESTER SCHWAB KATZ & DWYER, LLP**

**ATTORNEYS FOR**    **Defendant
METROPOLITAN LIFE INSURANCE
COMPANY**

120 BROADWAY
NEW YORK, N.Y. 10271-0071
(212) 964-6611
FAX:  (212) 267-5916