FRANKEL & NEWFIELD, P.C.
585 Stewart Avenue, Suite 301
Garden City, New York 11530
(516) 222-1600
Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------
DEBORAH HOBSON,                           :
                                          :   05 Civ.7321 (AKH)
              Plaintiff,        :
                                          :
    - against -                         :   **ECF**
                                          :
MET LIFE INS. CO.,                        :   Plaintiff's Rule 56.1 Statement
              Defendant.        :
---------------------------------------------------------

      Plaintiff, by her attorneys, Frankel & Newfield, P.C., as and for a statement pursuant to Local Rule 56.1 contends that there is no genuine issue to be tried with respect to the following materials facts as follows:

      1.     As an employee of KPMG LLP, plaintiff Deborah Hobson ("Ms. Hobson") was eligible to participate in the Disability insurance coverage ("LTD plan") at issue herein. ML0008[1].

      2.     Ms. Hobson became disabled under the LTD plan on February 14, 2001. ML0752. Defendant accepted liability of the claim based upon ulcerative colitis and fibromyalgia. ML0202.

      3.     After satisfying the elimination period of 180 days, benefits were payable beginning on August 13, 2001. ML0752.

---

[1]    All references to ML- - - are to the record compiled by Defendant, with ranges of ML0001- ML1087.

4. Defendant did not initially accept liability of the claim, instead Defendant failed to issue approval of Ms. Hobson's long term disability claim until over eighteen (18) months following her disability onset, on August 21, 2002. ML0752. In Defendant's August 21, 2002 letter, Defendant acknowledged that Ms. Hobson became disabled on February 14, 2001. ML0752

5. Almost immediately after finally approving Ms. Hobson's claim (November 2002), Defendant sought to undertake an investigation of Ms. Hobson's disability at the transition definition for disability (from own occupation to any occupation), despite the fact that the LTD plan had an own occupation definition of disability for 36 months, or until August 2004. ML0055.

6. While Ms. Hobson was being paid disability benefits by the Defendant, she was awarded Social Security Disability Benefits. ML0782-90.

7. Defendant received the benefit of offsetting Ms. Hobson's disability benefits by Social Security's finding that Ms. Hobson was disabled from engaging in any occupation in the national economy. ML0015.

8. During the pendency of Ms. Hobson's claim, Defendant terminated her benefits -- only to later re-instate benefits several times. Ms. Hobson's claim was terminated by Defendant (for the final time) in a December 15, 2004 letter that closed the claim retroactively to December 8, 2004. ML0357-58.

9. At that time, Defendant purportedly determined that Ms. Hobson was no longer unable to perform the duties of any job for which she was qualified taking into account her training, education and experience. ML0357-58.

10. On appeal of the terminated claim, Defendant purportedly determined that Ms. Hobson was not disabled because her mental state was not severe enough because she did not have "suicidal ideation: or required hospitalization. ML0203.

11.  On appeal of the terminated claim, Defendant purportedly determined that Ms. Hobson was not disabled because, although she had chronic illnesses and suffered from Dercum's Disease, her records did not identify which type of Dercum's Disease she suffered, and because the records did not discuss a treatment plan for the disease - despite the fact that there is no effective treatment for Dercum's Disease - as admitted by Defendant. ML0203.

12.  In fact, in reviewing Ms. Hobson's claim on appeal, Defendant felt that the most important reason why Ms. Hobson were not disabled was because of the lack of a treatment plan. ML0203.

13.  The appeal determination decided that Ms. Hobson did not substantiate a severity of symptoms that would prevent her from performing any other occupation. ML0203.

14.  At no time during its review of Ms. Hobson's claim did Defendant identify what other occupation Ms. Hobson could perform. Defendant did not identify what functional abilities Ms. Hobson had, thus, there was no analysis of how Ms. Hobson could perform some other occupation.

**Ms. Hobson's Disability and Support for Claim**

15.  Ms. Hobson became disabled on February 14, 2001. ML0752. She remained on claim (despite several efforts to terminate her claim in 2003 and 2004 and the subsequent reopening of her claim) until December 8, 2004.

16. She was and is not in good health, having suffered from the following medical conditions since 2001:

asthma
severe tremors
migraine headaches
depression
ulcerative colitis
ileostomy skin problems
seizures
thyroid cancer
fibromyalgia
sleep apnea
severe fatigue
heaviness in arms and legs
herniated disks in lower back and neck
arthritis

ML0469.

17. In February 2004, Ms. Hobson completed a "Personal Profile", a form utilized by Defendant to address individual's activity levels and education, training and experience, to assist in a review of continued eligibility for benefits during the transition to any occupation disability. ML0681-93.

18. Ms. Hobson provided significant detail to her responses, articulating a myriad of symptoms and the resulting functional limitations and restrictions that caused her to be impaired from working. ML0688-93.

19. Dr. Sessoms provided medical support, in the form of Defendant's Attending Physician Statement and Physical Capacity Evaluation, in February 2004. ML0277-81. On those forms, Dr. Sessoms placed restrictions and limitations on Ms. Hobson that would prevent her from performing the duties of any occupation. Id.

20. On July 9, 2004, Ms. Hobson provided Defendant with significant information regarding her level of functionality. She indicated that her health continues to decline, as well as her energy level. ML0528.

21. Ms. Hobson articulated that she usually needs a nap after just showering for the day, and that she takes afternoon naps for up to 3 hours. ML0528.

22. Ms. Hobson noted that some weeks are so bad that she does not do anything or leave the house at all. ML0528. Ms. Hobson also provided a listing of her medications as of July 8, 2004. ML0531.

**Defendant's First 2004 Claim Termination**

23. Months prior to the time of the transition of the definition of disability from own occupation to any occupation, Defendant sought to terminate Ms. Hobson's benefits. ML0075.

24. To accomplish this, Defendant sought a paid medical consultant review by Dr. Nesta. ML0488-90.

25. In his review, Dr. Nesta acknowledged the multitude of diagnoses suffered by Ms. Hobson. His review admits that Ms. Hobson suffered from degenerative changes in the lumbar spine with a L4-L5 central disc herniation and osteophytic changes and disc propulsion at T1-T2. ML0488.

26. Dr. Nesta admitted that Ms. Hobson suffered radiculopathy, however, he felt it was not "significant radiculopathy". ML0488.

27. Dr. Nesta also indicated that Ms. Hobson was diagnosed with fibromyalgia. ML0489.

28. However, he determined that "this does not usually preclude an individual from working." ML0489.

29. There is no indication that Dr. Nesta evaluated any of the medical records regarding fibromyalgia (other than to note that she had the diagnosis), or considered any of the opinions of Ms. Hobson's treating doctors as to Ms. Hobson's functionality relating to her suffering from fibromyalgia. ML0488-90.

30. In his conclusion, Dr. Nesta felt that, despite her "multiple diagnoses", none of the conditions appeared to impair her ability to do a sedentary position. ML0490.

31. The termination letter of August 31, 2004 noted that Dr. Nesta's report was sent to several of Ms. Hobson's treating doctors. ML0456.

32. Ms. Hobson was under the care of 9 doctors at that time. ML0524-25.

33. Defendant did not send the report to Dr. Rossi, her neurologist, for his opinion.

34. It is noted that one doctor was in agreement with the report (Dr. Price)[2], while two others were in disagreement. Dr. Doshi, one of Ms. Hobson's treating physicians, disagreed with Dr. Nesta's opinion. ML0507.

35. Dr. Nesta's review was also presented to Dr. Sandra Sessoms, another one of Ms. Hobson's treating physicians, who indicated that she did not agree with Dr. Nesta's opinion. ML0453.

36. Instead of considering the nature and scope of Ms. Hobson's treating physicians' disagreement with Dr. Nesta, Defendant disregarded Dr. Sessoms' and Dr. Doshi's disagreement with the paper review and terminated the claim effective August 12, 2004.

---

[2] Dr. Price, an infectious disease doctor, actually clarified his view, stating that he was not qualified to address his agreement or disagreement. ML0449.

### Ms. Hobson's Efforts to Reinstate Claim

37.   Thereafter, Dr. Sessoms, an Associate Professor of Medicine at Baylor College of Medicine, submitted a letter in support of Ms. Hobson's claim disagreeing with the opinion of Dr. Nesta, and indicating that "Ms. Hobson is unable to function in any responsible position due to her fibromyalgia and associated depression." ML0454.

38.   Her letter also referenced her last consult for the supporting findings and examination. ML0454.

39.   Defendant subsequently reinstated benefits for closed periods of time, allegedly relating to her surgery for thyroid cancer. ML0357.

40.   These dates were extended several times, ultimately ending with the claim being terminated effective December 8, 2004.

### Defendant's December 2004 Claim Termination

41.   By letter dated December 15, 2004, Defendant terminated Ms. Hobson's benefits effective one week earlier, as of December 8, 2004. ML0357-58.

42.   In terminating Ms. Hobson's claim, Defendant alleged that her medical information was reviewed in detail. ML0358.

43.   Defendant alleged that the medical information was reviewed regarding her disability from any occupation. ML0358.

44.   Defendant purportedly determined that the medical information submitted did not substantiate her ability to work at her own occupation or any occupation. ML0358.

45.   No vocational review was contained within the December 15, 2004 denial letter (nor in the August 31, 2004 letter). No vocational review appears in the claim file whatsoever.

7

46. Lynn Schmelter, the "Senior Case Manager Specialist" who issued the claim termination, advised Ms. Hobson that she had a right to appeal the decision. She did not advise Ms. Hobson of any specific information that would assist in overturning the claim termination. ML0358.

### Ms. Hobson's Initial Appeal

47. Ms. Hobson provided support on appeal for the continuation of her benefits, which included medical materials, personal subjective information, vocational information and medical literature supporting the diagnosis of Dercum's Disease. ML0223-0350.

48. Ms. Hobson submitted a myriad of supporting materials, including medical records which rebutted the positions advanced by Defendant's paid medical reviewers. See ML0220.

49. Ms. Hobson underwent an abdominal ultrasound on January 28, 2005. ML0220.

50. The report indicates nonspecific thickening of the gallbladder, and possible fatty infiltration of the liver. ML0220.

51. This report was transmitted to Defendant via fax on February 2, 2005, ML0219-20.

52. This would directly rebut one basis of Dr. Truxal's opinion as to whether the diagnosis of Dercum's Disease was proper.

53. Ms. Hobson articulated her functional limitations in a two page "Inability to Work" statement. ML0326-27.

54. She described her conditions as follows:

- The muscles in my neck get so tired that I must sit lower in a sofa or lay down;
- The muscles in my jaw and face get tired when I talk too much;
- I walk down the stairs sideways to reduce the pain;
- I have trouble opening boxes and jars due to weakness and pain;
- I am unable to write legibly at times due to tremors, weakness, and cramps in my hands;
- I am often too tired to dress for the day;

8

- I often ask friends or family to drive me to doctor appointments;
- If someone else is available to drive, I ask them to;
- I have migraine headaches frequently, often daily;
- I have frequent doctor appointments, usually one or more per week;
- Even with a CPAP mask, I have sleeping problems due to pain;
- I have muscle cramps all over my body, even in my ribcage when bathing;
- My eyes hurt, are very sensitive to light, and reading makes it worse (dry eyes).

ML0326-27.

55. To summarize how she feels, Ms. Hobson articulated that she struggles each day just to live with the constant pain, muscle cramping and weakness while trying to find the energy to do simple things like drive to the grocery store one half a block away. ML0326-27.

**Defendant's Appeal Determination**

56. By letter dated March 16, 2005, Defendant upheld its claim termination. Defendant's termination was upheld on the basis of two paid consultant reviews. One review was from a neurologist/psychiatrist, and one from an internal medicine doctor. There was no vocational review performed.

<u>Dr. Delaney's Paid Medical Review</u>

57. Defendant's paid consultant's review by Dr. John Delaney, dated February 11, 2005, does not indicate that any information about Dercum's Disease (either the literature or the medicals) was reviewed or considered. ML0213-18.

58. Nonetheless, Dr. Delaney does discuss Dercum's Disease in his report, where he notes that there is no effective treatment and it leads to lifelong disability. ML0216.

59. Notwithstanding Dr. Delaney's agreement with the diagnosis of Dercum's Disease and his identification of a host of medical conditions, Dr. Delaney concluded that Ms. Hobson

9

"seems to be functional", despite the "number of chronic medical problems which are severe." ML0217.

60. Dr. Delaney opined that the only medical issues that would impact her functionality from a disability perspective would be:

> 1. whether she is having ongoing seizures that are not well controlled and prevent her from driving or getting around to the point where she is unable to work because the seizures are recurrent, constant or poorly controlled.
> 2. Whether the depression would be severe enough to actually have suicidal ideation or whether this depression requires inpatient hospitalization.

See ML0218.

61. Thus, according to Dr. Delaney, Ms. Hobson could only be viewed as impaired from working if she had uncontrollable seizures, or was either suicidal or required hospitalization for depression. ML0218.

### Dr. Truxal's Paid Medical Review

62. Defendant's paid consultant's review by Dr. Blair Truxal, dated February 14, 2005, does not indicate that any information about Dercum's Disease (either the literature or the medicals) was reviewed or considered. ML0207-12.

63. After Dr. Truxal notes that "[T]his is an extremely complicated medical case with multiple records", he determines that the "easier" approach is to work with the issues that post-date a review by Dr. Joseph Nesta (on behalf of Defendant) in July 2004. ML0210.

64. Dr. Truxal then notes that Ms. Hobson has been disabled from 2001 to 2004. ML0210.

65. Dr. Truxal then proceeds across diagnoses, addressing Ms. Hobson's ulcerative colitis, thyroid cancer, sleep apnea, fibromyalgia, spinal degenerative disease, migraines, seizures, and then Dercum's Disease. ML0210.

66. Dr. Truxal felt he needed to focus primarily on the Dercum's Disease, as it was the most recent diagnosis, which he notes was made at Baylor College of Medicine after consultation during ground [sic] rounds. ML0210. Thus, Dr. Truxal did not properly consider any of the other conditions suffered by Ms. Hobson and articulated in her claim file.

67. Dr. Truxal found that the only medical records supporting Dercum's Disease consisted of a January 21, 2005 letter from Dr. Subrt, Ms. Hobson treating physician. ML0211.

68. He notes, however, that "after careful review, I see no diagnostic criteria or physical findings to support this diagnosis." ML0211.

69. Dr. Truxal thus seeks to assert a myriad of rationales for why the diagnosis should not have been made by the 50 or so physicians who examined Ms. Hobson. He claims that there are no laboratory diagnostics supporting the diagnosis. ML0211.

70. He claims that she does not exhibit certain physical manifestations, such as intermittent finger swelling. ML0211.

71. He also claims, most significantly according to him, that the diagnosis could not exist because there was no mention of a treatment plan. ML0212.

72. He asserts that there are treatment plans available, although they are not extremely effective. ML0212.

73. Dr. Truxal thus concludes, contrary to the examining doctors at Baylor College of Medicine, that Ms. Hobson does not meet the diagnosis of Dercum's Disease. ML0212.

74. Defendant adopted the conclusions of its paid medical consultants, and ignored the findings and opinions of Ms. Hobson's treating physicians. ML0202-06.

11

### Ms. Hobson's Further Appeal

75. Ms. Hobson submitted an appeal of Defendant's claim termination by letter dated April 1, 2005. ML0184-0187.

76. Ms. Hobson's appeal identified the nature of her presentation to Dr. Subrt regarding the ultimately diagnosed Dercum's Disease. She notes that she made an appointment to discuss the many painful fatty lumps she had all over her arms, legs and trunk. ML0229.

77. Her letter discusses the presentation at grand rounds at Baylor College of Medicine, and the ultimate diagnosis of Dercum's Disease. She discusses how she then was advised to search the internet to learn more about this rare disease, and she included the printed materials in her appeal, for consideration by Defendant. ML0229.

78. Ms. Hobson's appeal also identified a number of mistakes contained in the letter upholding the termination of benefits, which relied upon the Defendant paid consultants' opinions. First, Ms. Hobson notes that the paid, paper reviewing neurologist (Dr. Delaney) relied upon by Defendant did not discuss her diagnosis of Dercum's Disease - notwithstanding the fact that the discoverer of the disease, Dr. Dercum, was a neurologist. ML0184.

79. Ms. Hobson identified a mistake regarding a medication that was attributed to her, Capra, that she has never taken. ML0184.

80. Ms. Hobson noted that she had increased her anti-depressant medication, Effexor, due to increased symptoms. ML0184.

81. Ms. Hobson challenged the opinion offered by the paid consultant regarding her alleged level of functionality, by noting that while she is able to take care of herself, she is not always able to function on any given day. She related that some days, she is unable to make it out of the house, and that being able to take care of her own needs is all she could do. ML0184.

82. Ms. Hobson noted that such a level of "functionality" hardly translates to being able to work. ML0184.

83. Ms. Hobson challenged the finding of Defendant's paid medical review that she does not suffer from side effects from her medications (ML0185), noting that she is extremely sensitive to medications, has tingling in her fingers and toes, dizziness and constant nausea from taking so many medications. ML0185.

84. Ms. Hobson identified office visit notes from Dr. Rossi - her neurologist - and other records as the source for challenging the credibility of the statement. ML0185.

85. Ms. Hobson addressed the inconsistency of Defendant's paid consultant's review and opinion that she could perform sedentary work without difficulty, by noting that the medical literature provided (but perhaps not reviewed) regarding Dercum's Disease was clear that patients suffering from Dercum's Disease cannot work in sedentary or static positions due to stiffness and pain. ML0185.

86. Ms. Hobson identified migraine headaches as being well documented in her file. ML0185. She directly rebutted many of the items which formed the basis of the opinions.

87. Ms. Hobson challenged Defendant's paid consultant's report that did not see any diagnostic criteria or physical criteria to support the diagnosis of Dercum's Disease - despite the grand rounds at Baylor College of Medicine's 50 doctors arriving at the diagnosis, AFTER examination. ML0185.

88. Ms. Hobson supported her position that the consultant's credibility was strained by noting that she was examined by the doctors who diagnosed her, versus the paper reviewing physician's conclusions. ML0185.

89. Ms. Hobson further challenged the credibility of Defendant's paid consultant by attacking the basis for his conclusions, namely that no treatment plan was put in place - despite it being well known that treatments are ineffective. ML0186.

90. Ms. Hobson also attacked the basis by addressing the fact that the diagnosis is made by clinical findings, rather than any laboratory tests, or other diagnostic criteria. ML0186.

91. Ms. Hobson further attacked the validity of Defendant's paid consultant's opinion by articulating the fact that her treating doctors have provided medical information supporting functional limitations. ML0186. These include office notes from Dr. Sessoms, which reveal arthritis and joint pain.

**Defendant's Decision to Uphold Termination**

92. Defendant reached a decision on Ms. Hobson's appeal after seeking two medical reviews. No vocational review was conducted.

93. The medical reviews consisted of Dr. Robert Polsky, a Psychiatrist, and Dr. Gary Markewich, a Dermatologist. The instructions for the medical review were for the reviewers to contact the physicians. See IME/PFR Referral. ML0180-82.

94. By letter dated May 5, 2005, Defendant advised Ms. Hobson that based upon the medical reports of their reviewers, the termination of benefits from December 2004 was upheld. ML0159.

<u>Dr. Polsky's Paid Medical Review</u>

95. Dr. Polsky purported to review Ms. Hobson's records (allegedly consisting of 421 pages), on April 22, 2005. ML0168-ML0171.

14

96. Various medical records were identified as purportedly reviewed, and the bulk of documentation (150) pages were simply identified as misc (miscellaneous) - thus not identifying what was actually contained in that material. ML0169.

97. Dr. Polsky alleges to have conducted a "thorough review of the submitted medical information". ML0169.

98. Dr. Polsky notes that the "bulk of the clinical documentation deals with Ms. Hobson's various medical problems." ML0169.

99. Dr. Polsky noted his one attempt to speak with Dr. Wardell and the inability to hold a conference call due to the lack of a release. ML0170.

100. Dr. Polsky's report seems to emphasize that Ms. Hobson's records do not note that she is suicidal, homicidal, or psychotic. ML0170.

101. Dr. Polsky also emphasized that there was no objective documentation of problems with memory, cognition or concentration. ML0170.

102. Dr. Polsky thus concludes that Ms. Hobson is not impaired, because, he asserts, there is not evidence that she is suicidal, homicidal, psychotic, or psychiatrically impaired to an extend that significantly impacts activities of daily living. He also concludes, on the basis of her allegedly well written correspondence, that she has no cognitive impairment, or problems with memory. ML0170.

### Dr. Markweich's Paid Medical Review

103. Dr. Markewich purported to review Ms. Hobson's records (allegedly consisting of 421 pages), on April 22, 2005. ML0163-ML0166.

104. Various medical records were identified as purportedly reviewed, and the bulk of documentation (150) pages were simply identified as misc (miscellaneous) - thus not identifying what was actually contained in that material. ML0164.

105. Dr. Markewich alleges to have conducted a "thorough review of the submitted medical information". ML0164.

106. Dr. Markewich notes that the bulk of the records reference "ulcerative colitis and other problems, but near the end they came up with a dermatologic diagnosis to try to pull everything together." ML0164.

107. Dr. Markewich notes that Ms. Hobson received a diagnosis of Dercum's Disease, which he notes is "a very rare, possible autosomal dominant inherited disease which includes painful fat and seizures and multiple other symptoms many of which she has exhibited." ML0164.

108. Dr. Markewich noted that the diagnosis was confirmed by a group of 50 to 60 doctors. ML0165.

109. He agreed with Dr. Subrt's diagnosis of Dercum's Disease, opining that it is a "very rare disease that nobody understands, nobody is sure about." ML0165.

110. He further opined that pain is a subjective finding, and especially in this case there are no objective findings. ML0165.

111. Dr. Markewich concludes by stating that she may have some impairment, but from a dermatologic standpoint, it would not be concluded that she is "totally unable to work". ML0165.

112. Dr. Markewich also completed an "Estimation of Physical Capacities" form (ML0178-79) which remarkably did not find any restriction whatsoever in Ms. Hobson's functionality, despite his indication that she may have some impairment.[3] ML0165.

113. Yet, Dr. Markewich indicated that the patient had not achieved maximum medical improvement (MMI) - despite not having any limitations. ML0179.

---

[3] The literature indicates that light physical activity may worsen symptoms and that patients should avoid monotonous, static work. www.icomm.ca/geneinfo/adiposa/htm. ML0244.

**Ms. Hobson's Challenge to the Appeal Uphold**

114.   After receiving Defendant's appeal decision, Ms. Hobson prepared a response dated May 13, 2005. ML0148-49.

115.   The response addressed the infirmities in the paid consultants' paper reviews performed by Dr. Polsky and Dr. Markewich. The response also included further claim support from Dr. William Wardell, specifically to address an erroneous contention made by Defendant's reviewing doctor. ML0150.

116.   The response also referenced a further report from Dr. Paul Subrt to clarify a misstatement by Dr. Markewich in his review.

<u>Ms. Hobson's attack of Dr. Polsky's report.</u>

117.   Ms. Hobson's May 13, 2005 letter addressed a number of issues that were utilized in formulating Dr. Polsky's report. She first noted that, contrary to Dr. Polsky's contention, her letters and filings with Defendant were the product of help from her daughter and created over periods of times, sometimes days, sometimes weeks. ML0148.

118.   In formulating his opinions, Dr. Polsky had opined that her letters contain no evidence of cognitive impairment. ML0170.

119.   Ms. Hobson also addresses the efforts to reach Dr. Wardell and that Dr. Wardell would not speak to Dr. Polsky without a proper release. ML 0148.

120.   She notes that Dr. Polsky made only shallow efforts to reach Dr. Wardell. ML 0148.

121.   Dr. Wardell noted in his May 17, 2005 letter that Ms. Hobson's medical conditions for which he treated her had actually worsened - and that his diagnosis remained Major Depressive Disorder, Recurrent, Severe without Psychotic Features (DSM-IV-TR:296.33). ML0150.

122. Significantly, Dr. Wardell once again opined that her disorder was of such a severity that she was unable to function consistently enough to sustain employment. ML0150

123. Of greater significance, Dr. Wardell made himself available to Defendant (or its medical personnel) to speak to him should there be any questions. ML0150.

124. Dr. Paul Subrt submitted a letter dated May 11, 2005 which addressed Ms. Hobson's medical condition, noting that she was diagnosed with Dercum's Disease - based upon her signs and symptoms (and discussing how there are no specific laboratory tests to prove the diagnosis). ML0155.

125. Significantly, Dr. Subrt believed that the opinions of disability were appropriately made by those with neurologic, psychiatric or rheumatologic expertise, rather than dermatologic. ML0155.

126. Most significantly, Dr. Subrt challenged the statement attributed to him by Defendant that he did not understand why Ms. Hobson could not do her job. Rather, he suggested that such a conclusion was beyond his medical qualification to opine. ML0155.

**Defendant's Final Claim Outcome**

127. Defendant refused to alter its claim termination. First, by letter dated May 11, 2005, Defendant advised Ms. Hobson that the May 11, 2005 additional medical information submitted by Dr. Subrt that very same day did not change its determination. ML0152.

128. Thus, the very same day that additional medical records were received by Defendant in support of Ms. Hobson's claim, Defendant rejected such support. ML0152.

129. Then, by letter dated May 19, 2005, Defendant notified that the additional medical information submitted by Dr. Wardell did not change its determination. ML0151.

130. Only two days after getting the Dr. Wardell letter, (offering to speak with anyone with questions), Defendant took no action to clarify the apparent dispute between its medical reviewers and Ms. Hobson's doctors.

131. Defendant admitted Ms. Hobson's inability to perform the duties of her occupation by virtue of accepting liability for her claim from the onset date of her disability in February 2001 until August 2004, when it purported to terminate the claim at the any occupation transition. ML0202.

132. Defendant has not articulated why Ms. Hobson was disabled from her own occupation during the own occupation period, but not disabled from her own occupation during the any occupation period.

Dated: Garden City, New York
October 12, 2006

Respectfully submitted,

FRANKEL & NEWFIELD, P.C.
Jason Newfield (JN5529)
Justin Frankel (JF5983)
Attorneys for Plaintiff
Frankel & Newfield, P.C.
585 Stewart Avenue, Suite 301
Garden City, New York 11530